UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                                          Case No. 8:05-CR-365-T-27TBM

SERGIO PORTOCARRERO-REINA; et al.
_____/

ORDER

**BEFORE THE COURT** is Defendant Mina's Motion to Dismiss (Dkt. 58) and the Government's Response in opposition (Dkt. 78).[1] The Court conducted an evidentiary hearing on the Motion to Dismiss. At the conclusion of the hearing, the Court made findings of fact and denied Defendant Mina's Motion to Dismiss (Dkt. 58). This Order memorializes that ruling.

On or about August 19, 2004, the Columbian fishing vessel RIO MAR I was interdicted by the U.S. Coast Guard cutter USS JARRETT in international waters approximately 90 nautical miles southwest of the Galapagos Islands. Prior the interdiction, the RIO MAR I had been surveilled, as it was operating in an area known for drug trafficking. During surveillance, a cable attached to and trailing from the stern of the RIO MAR I was observed. The Coast Guard suspected that the RIO MAR I was engaged in drug trafficking and was towing an identified object. After receiving authority from the Columbian government, the Coast Guard boarded the RIO MAR I. Thereafter, the Coast Guard located a submersible approximately 15 miles from where the RIO MAR I had been boarded. By the time the submersible had been located, the USS JARRETT and RIO MAR I were

---

[1] All Defendants have joined in Mina's Motion to Dismiss. All previously filed motions to adopt were granted. (See Dkts. 62, 70, 77, 80, 84, 85, 93, 103, 105, 63, 101, 102, 100, 99, 97, 104, 109, 110).

approximately 68 nautical miles away. Attached to the submersible was a 350 ft. cable. On the submersible was approximately 5500 lbs. of cocaine. The cable and chafing gear attached to the submersible's nose appeared to match what had been observed attached to the stern of the RIO MAR I. Suspecting that the RIO MAR I had been towing the submersible, the USS JARRETT escorted the RIO MAR I to the submersible.

During the inspection of the submersible and the RIO MAR I, more than 300 photographs of the RIO MAR I and submersible were taken. Additionally, a video was taken of the interior of the submersible, including its electronics and hardware. The Coast Guard documented the dimensions of the submersible and the RIO MAR I, including the RIO MAR I's tonnage, engines and physical characteristics. A tow bit to which the cable had been attached was cut from the stern of the RIO MAR I and preserved. The electronics from both vessels were preserved.

The Coast Guard desired to bring the RIO MAR I and the submersible to port, particularly since it had not intercepted a submersible being used in drug trafficking before. Through the chain of command, the Coast Guard exhausted all reasonable methods of preserving the submersible, including an unsuccessful attempt to lift it from the water using the USS JARRETT's helicopter. An attempt to use the USS JARRETT's davit system was unsuccessful, causing damage to the chains and davit. The USS JARRETT was running low on fuel and it was calculated that it would take approximately ten days or 200 hours for the USS JARRETT to tow the submersible to the nearest port in Panama, approximately 1,080 nautical miles. The USS JARRETT's commanding officer determined that the USS JARRETT did not have the proper equipment to tow either the RIO MAR

I or the submersible.[2]

On August 24, 2004, it was determined that the RIO MAR I and the submersible would be sunk as hazards to navigation. Extensive discussions had taken place throughout the chain of command exploring alternatives to destroying the RIO MAR I and submersible. After two and a half days of discussions and attempts, it was determined that it was not practical to bring either the RIO MAR I or the submersible to port. The Coast Guard followed its standard protocol for determining whether to sink the vessels as navigational hazards. In addition to the USS JARRETT being low on fuel, its commander had concerns about potential risk to the USS JARRETT if it attempted to tow the submersible to port. Moreover, because of Hurricane Katrina, there were no viable "assets" available to transport the submersible.

After the decision had been made to destroy the RIO MAR I and submersible, the commander of the USS JARRETT was instructed to photograph everything and conduct a thorough investigation. An intrusive investigation of the RIO MAR I was conducted as well. Although the Coast Guard found three monofilament fishing lines attached to the stern of the RIO MAR I, there were no hooks attached. Five to ten hooks were found on the deck of the RIO MAR I, its fishing nets were dry, there was no bait on board. Other than ice in the fish hold, the Coast Guard found no evidence of commercial fishing activity on the RIO MAR I. Photographs were taken of all fishing equipment, including the ice in the hold. Chafing gear similar to that found attached to the submersible was located on the RIO MAR I and photographed, before it was removed and preserved.

Defendants contend that the destruction of the RIO MAR I and submersible prevent them

---

[2] Although the RIO MAR I was described as somewhat seaworthy, the boarding crew observed fuel in the bilge and had concerns over its seaworthiness. The crew also observed that the RIO MAR I was taking on water.

from investigating and determining whether the RIO MAR I was capable of towing the submersible, and was outfitted for fishing as the Defendants maintain. Acknowledging the hundreds of photographs of the RIO MAR I and submersible and the videotape of the interior of the submersible, Defendants nonetheless contend that the destruction of the vessels in and of itself violated their due process rights.

Where evidence has been lost or destroyed, a defendant who contends that the missing evidence is material to the defense must satisfy a two-prong materiality standard. *California v. Trombetta*, 467 U.S. 479 (1984). The defendant must show that the exculpatory value of the evidence was apparent before the destruction and that the defense would be unable to obtain comparable evidence by other reasonably available means. *Id.* at 489. Additionally, where the defense establishes that the destroyed evidence would have been potentially useful as a basis for exonerating the defendant, a defendant must show that the government acted in bad faith in destroying the evidence. *Arizona v. Youngblood*, 488 U.S. 51, 57-8 (1989).

Here, even assuming for purposes of the instant motion that the RIO MAR I and the submersible possessed exculpatory value which was apparent to the Coast Guard before the vessels were sunk, and that the Defendants are not able to obtain comparable evidence by other reasonably available means, Defendants have not shown that the Coast Guard acted in bad faith when it determined to sink the RIO MAR I and submersible as hazards to navigation.[3]

---

[3] In this unique case, where the Government's burden will be to establish that the submersible had been towed by the RIO MAR I, the desirability of an opportunity to inspect the physical characteristics of both vessels is understandable. The physical evidence in this case is expected to play a significant role in the defense. The weight and configuration of the submersible and the RIO MAR I's towing capability will be material to the Government's theory. While the Court assumes, for purposes of this motion, that both vessels have exculpatory value which was apparent before they were sunk and that the Defendants are not able to replicate the vessels, the Court has not been convinced that the defense actually is unable to obtain comparable evidence through use of an expert witness. Other than general contentions and argument, Defendants have presented no evidence of their inability to reconstruct the physical evidence through use of the photographs and videos taken, as well as the physical evidence which was preserved.

The Coast Guard followed its standard protocol in determining whether the sink the RIO MAR I and submersible as navigational hazards. The Coast Guard had exhausted all reasonable alternatives of preserving the submersible, including the extraordinarily risky attempt to lift it through use of the USS JARRETT's helicopter. The USS JARRETT damaged its davit system when attempting to lift the submersible from the water. It was not practical to tow the submersible or the RIO MAR I to port, given the USS JARRETT's low fuel and the distance. To the extent the Defendants argue that the RIO MAR I could have been sailed to port, there was sufficient evidence of unseaworthiness to support the Coast Guard's decision not to do so, particularly considering the time and distance involved. Before sinking the vessels, the Coast Guard took hundreds of photographs and documented the interior of the submersible through video. The video, number of photographs and the evidence preserved mitigates against any suggestion that the Coast Guard sank the RIO MAR I and submersible in bad faith for the purpose of destroying evidence which could exonerate the Defendants. Moreover, with respect to the submersible, the Coast Guard had at least as great an interest in preserving it as Defendants.

With respect to the RIO MAR I, its seaworthiness was questionable and it was not feasible or practical to sail it over 1,000 miles to Panama. The Coast Guard had other interdiction responsibilities, the RIO MAR I was taking on water, there was evidence of fuel in the bilge and it would have taken weeks to sail it to Panama. In any event, the hundreds of photographs of the RIO MAR I and the evidence preserved from it mitigates against any suggestion that it was sunk for the purpose of destroying evidence which arguably could exonerate the Defendants. To the extent Defendants contend that the RIO MAR I was simply a fishing boat, they have ample testimony and evidence available, as a result of the Coast Guard's evidence accumulation, to support that claim.

In sum, the Coast Guard followed its standard protocol for the sinking of a vessel as a navigational hazard. All efforts to preserve the submersible had been exhausted. It was not practical to tow either the RIO MAR I or the submersible to port and they could not simply be abandoned on the open sea without posing a hazard to navigation. The sinking of the RIO MAR I and submersible have not, therefore, been shown to have been conducted in bad faith. Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant Mina's Motion to Dismiss (Dkt. 58) is DENIED.

**DONE AND ORDERED** in chambers this 4th day of May, 2006.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record